[NO. 2327.]

## JULIUS KUNDE *v.* THE STATE.

1. EVIDENCE—MOTIVE—INDICTMENT.—It is now well settled that an indictment against a defendant for an offense different from that for which he is on trial, may be introduced in evidence against him if such indictment, in any degree, tends to show a motive on the part of the defendant to commit the offense for which he is on trial.

2. SAME—CASE STATED—It is objected that the indictments introduced in evidence in this case were not admissible for any purpose, because they were presented subsequent to the murder for which the defendant was on trial.   But *held* that the objection is not good in this case, because the said indictments were connected by other testimony with transactions which occurred before the murder, and which tended to show a motive on the part of defendant to commit the murder.   The reproduced testimony of a deceased justice of the peace disclosed prosecutions against the defendant and others for offenses against the property of the deceased shortly before the murder, in which prosecutions deceased was an important and indispensable witness.   *Held* that, though meagre and indefinite, the reproduced testimony of the defunct justice of the peace was admissible to establish motive, and qualified the indictments as evidence to explain that the defendant was one of the parties charged with the offense against the property of the deceased.

3. SAME—EVIDENCE.—Article 751 of the Code of Criminal Procedure reads as follows:  "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; as when a letter is read, *all* other letters on the same subject between the same parties may be given.   And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence."   That portion of the written testimony of the deceased witness, M., read by the State in this case, related solely to the prosecution of the defendant and his co-defendants.   That part proposed to be read by the defense related solely to a prosecution against the deceased.   *Held*, that that portion of the testimony offered to be read by the defense had no relation whatever to that portion read by the State, was not necessary to explain the portion read, was clearly inadmissible under the provisions of the said article of the Code of Criminal Procedure, and was properly excluded.

4. MURDER—EVIDENCE—CASE STATED—CASES OVERRULED.—The evidence in this case disclosed that Taylor Kunde, one of the parties jointly indicted with this defendant, was near the place of the murder at the time it occurred, and had equal opportunity with the defendant to commit it; that, on the night of the murder, the said Taylor Kunde furnished two Mexicans with a double barrelled shot gun each; that the said Mexicans

left the said Taylor Kunde's house that night before the murder was committed, taking the guns with them, and that, when they returned with the guns on the next morning, one barrel of each gun appeared to have been recently discharged. The murder was perpetrated by the use of fire arms. Under this state of proof the defense proposed to reproduce the testimony of a deceased witness to show certain acts and declarations of the said Taylor Kunde, shortly prior to the murder, which acts and declarations tended strongly to show malice on the part of Taylor Kunde towards the deceased, and a motive on his part to commit the murder. *Held*, the exclusion of this evidence was error. The ruling as made by the trial court upon this question is supported by early decisions of this court (Bowen's case, 3 Texas Ct. App., 617: Boothe's case, 4 Id., 202; Walker's case, 6 Id., 576; and Holt's case, 9 Id., 571); but as the same has been modified by later decisions, those authorities are overruled. The rule now established is that "investigation with reference to other parties than the accused should not be permitted in cases either positive or circumstantial, unless the inculpatory facts are such as are proximately connected with the transaction. In other words, to show remote acts or threats would not be admissible unless there were other facts also in proof proximately and pertinently connecting such third party with the homicide at the time of its commission." Note the approval on the question of McInturf's case, 20 Texas Court of Appeals, 335, and authorities cited.

5. SAME.—See the statement of the case for evidence *held* sufficient to establish the identity of certain papers, and thus qualify them as evidence in the case.

6. SAME.—The trial court did not err in permitting and directing a State's witness to retire from the court room into a room by himself, so that he could examine certain papers for the purpose of identifying and explaining them in his evidence.

7. SAME—CASE STATED.—The State sought, in this case, to throw discredit upon certain defense witnesses who testified to certain facts connected with the presence of Mexicans near the scene of the murder when it was perpetrated, by proving that the said witnesses, when examined upon the habeas corpus trial of the defendant, said nothing about the Mexicans. The defense proposed to explain the silence of the said witnesses as to the Mexicans on that occasion by proving by one R. that he was the attorney for the defendant in that proceeding; that he did not interrogate the said witnesses about the said Mexicans, and that, because of the prejudice existing against the defendant at the time, he did not expect to obtain bail for him, and did not undertake to develop the evidence in his behalf. *Held*, that such proof was competent for the purpose for which it was offered, and should have been admitted.

8. SAME—FACT CASE—See the statement of the case for evidence *held* insufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Guadalupe. Tried below before the Hon. George McCormick.

The indictment in this case was joint against the appellant, Taylor Kunde, Albert Kunde, Ludwig Kunde and Frederick Kunde, and charged them with the murder of Jobey Drennon, in Guadalupe county, Texas, on the twenty-sixth day of October, 1874. The appellant being alone upon trial was convicted of murder in the first degree, his punishment being assessed at a life term in the State penitentiary.

Mrs. C. A. Snodgrass was the first witness for the State. She testified that she was the wife of the deceased at the time of his assassination, and was with him when, on the night of October 26, 1874, at about eleven o'clock, he received his fatal wound. The shooting occurred on the Seguin road, in Guadalupe county, at a point in a lane between the houses of Jasper Conley and Ludwig Kunde, the father of the defendant. The defendant at that time was living with his father, at the latter's house, which was situated about a quarter of a mile from the point where the shooting occurred. The witness, riding one horse, and the deceased and their seven year old daughter riding another, were on their return home from church. When the fatal shots were fired, the witness was riding a short distance from the deceased on his left side. When they reached a point in the Kunde and Conley lane, a shot was fired from Kunde's field, which formed the left side of the lane as the witness and deceased were then traveling. That shot wounded the witness and her daughter, the latter dying from the effects of her wounds on the following Wednesday. Deceased exclaimed: "You are shot," and instantly another shot was fired from Kunde's field, the child fell to the ground, and the deceased fell on her. He died within thirty minutes. Both of the shots were fired from Kunde's field on the left hand side of the road. Witness saw no person at the time. W. T. Bryant was the first person who reached the scene of the shooting after it occurred.

The witness was not aware that the defendant had ever uttered a direct threat against her husband. She knew, however, that the deceased and defendant had been good friends until some trouble arose between the Kundes and deceased about some hogs a little time before the assassination. About a month before that event (the assassination) the defendant joined witness and her husband, while riding along the public road, and a conversation ensued about some hogs which deceased detected Fred Kunde burying. Defendant asked deceased if he thought he, defendant, killed the hogs. Deceased replied: "I do not

know whether you did or not, but your brothers did kill them. I saw one of them burying the hogs." Defendant then asked deceased what he was going to do about it. Deceased replied: "I do not know; that is my business." Thereupon the defendant slapped the deceased's shoulder and said: "They will be dear hogs to you." The defendant and the deceased met once subsequently in the presence of the witness, when the deceased spoke to the defendant, but the defendant did not reply.

Cross examined, the witness testified that if the deceased and Taylor Kunde had ever had a difficulty about the ginning of a bale of cotton, she had never heard of it. It was her impression that all of the Kunde boys, including the defendant, were arrested about the hogs.

S. D. Hawkins was the next witness for the State. He testified that in October, 1874, he lived in Guadalupe county, Texas, about nine miles west from Seguin, and between six and eight miles distant from the house of the deceased. The witness was acquainted with the deceased and saw his dead body. Witness, in company with Parson, Jones, Tom Reese and John Morrison, went to the place of the killing on the morning after it occurred. The point where the deceased was said to have received his fatal wound was in the lane formed by the fences enclosing the places of Ludwig Kunde and Jasper Conley, and about three hundred yards from the house of Ludwig Kunde, which stood inside of his enclosure or pasture. An ambush formed of brush was found inside and near the corner of Kunde's fence. Another was found inside the same enclosure against the fence, some thirty or forty yards distant from the first. Both were near the alleged place of the killing, and on the left of the road leading from the church to the deceased's house. A piece of gun wadding, made of German newspaper, was found in the road near where deceased was said to have fallen. Tracks were found at both ambushes, which the witness followed a short distance with Morrison. He did not trail them far, and though they led separately in the general direction of Ludwig Kunde's house, he was unable to say that they proceeded to that point, that they came together, or that they continued in the same or different directions. Witness did not now remember how many different tracks he saw, but it was his impression that there were at least three. A measure was applied to one or two tracks. That measure was applied to the boot of one of the Kundes after arrest, and was found to fit exactly. Witness was now unable to say which of

the Kundes owned that boot. Witness did not know who took possession of the measure, and had not seen it since the trial on habeas corpus before Judge White, some twelve years ago. After the examination of the tracks the witness and his party went to the house of Mr. Conley, where they found a large crowd, including Mr. Joseph Zorn, assembled. Witness saw Mr. Zorn produce a piece of German newspaper which was said to have been found at Ludwig Kunde's house, and apply its torn place to a piece of the wadding found on the ground of the killing. It appeared to fit exactly, and Zorn and others appeared to read it. The two houses on Kunde's place were between two and three hundred yards apart. Witness did not know at which of those houses the defendant was arrested. Witness could call to mind no paper that he saw on the ground or at Conley's house except the gun wadding, and the fragment of newspaper to which it was fitted. Refreshing his memory by reference to his evidence upon the habeas corpus trial, the witness remembers that other pieces of paper, including a piece of writing paper, were picked up from the ground.

Cross examined, the witness testified that he reached the scene of the killing in the forenoon on the morning after it occurred, but could not recall the hour. Twenty or twenty-five persons were on the ground when witness arrived. Witness measured but one track. His recollection was that there was another, a larger track, on the ground. Witness could not remember whether he spoke of more than one ambush at the habeas corpus trial or not, but in fact he saw two, as stated on this trial. Drennon's body had been removed when witness arrived at the place of the murder, and there was nobody on the ground when he reached that point. Witness, Reese, Morrison and Parson Jones, and perhaps one or two others, went to the scene of the murder together. If the parties with witness had been to that place previously, witness did not know it, nor did he know how many had been there before he arrived. There were a large number of foot tracks in the road. Some of the wadding was found in the road, some on the fence, and one piece, the witness thought, was found inside of the pasture. Witness picked up one piece in the road. It was a small piece of German newspaper. Parson Jones picked up a piece, but witness could not say whether from the ground or from the top of the fence. The witness found the piece he picked up some ten or fifteen feet from the ambush. That point was some distance from where

the body was supposed to have fallen. The body fell in the lane road, about eight feet from the fence. The wadding found by witness was between the ambush and the point where the body fell, but nearer the ambush, some twenty or thirty feet perhaps from the ambush, and six or eight feet from the fence.

On his re-examination, the witness said that he meant that there were twenty-five or thirty people at Conley's house when he arrived at the house, and not that number of people at the place of killing when he reached that place. Reese, Jones and Morrison were the only people at the place of killing with the witness. Jones died about a year before this trial, so witness had been informed.

John Morrison was the next witness for the State. He testified that he went to the house of J. N. Conley, on the morning after the murder, and found a large crowd assembled. Witness was directed by Hawkins, who was at Conley's house, to go to the place of the killing, examine it, and return with report to him. On his arrival at the place, witness found blinds, breastworks or ambushes, constructed of green brush, stuck up, and that a fence rider had been taken from the fence. Near those breast works he found the tracks of three different persons, and the signs of shooting at the panel of the fence next to the one from which the rider had been removed. There were two ambushes, about four feet apart. The tracks of two persons stood near one of the ambushes, and the tracks of a third stood somewhat to the rear of the two mentioned. It was evident from an indentation made by a ball or shot, and fragments of wadding found, that shots had been fired from this ambush. Wadding had dropped inside and outside of the pasture, on a line from that point. Witness saw pieces of wadding at several places. Hawkins was not on the ground. He sent witness from Conley's house to examine the ground, return and report to him, which the witness did.

Of the two or three pieces of wadding picked up by the witness, the largest pieces were found in the lane, outside of the pasture. Witness did not pick up all of the pieces he saw, but only the larger ones. The only papers he saw on the ground were fragments of German newspaper and writing paper. The writing paper appeared to be pieces from an old copy book. Witness gave one of the fragments of German newspaper to Mr. Hawkins and Joe Zorn. The indentation on the top rail of the fence was made by a glancing buck shot, as well as witness

could tell. On the witness's return to Conley's house Hawkins appointed him and Hall, each with a posse, to go to the houses of old man Ludwig Kunde and Fred Kunde and arrest all parties to be found at either house. Witness and his party went to old man Kunde's and arrested the parties found there. On his return Hawkins sent him back to search for arms and ammunition. The witness found, in the side room of old man Kunde's house, a double barrelled shot gun and an old yäger. He did not examine either. He found some cartridges on a shelf in the house, and an old German pamphlet. The pamphlet and the wadding found at the place of the killing appeared to the witness to be of the same paper. He also found an old copy book, but did not examine it very closely. The word " Roan" was on the fragment of writing paper found at the place of killing, and the same word was found on the pieces of copy book found at the house.

When witness reached old man Kunde's house he asked for the defendant and Fred. The old man and Albert, who was present, said they were at home, a half or three-quarters of a mile distant. The tracks described by witness ranged, he thought, in size from a number five boot or shoe to a number seven. Witness did not know the size of defendant's foot, but it was small. What particularly directed witness's attention to the small track was that the impression showed a medium sized metal-rimmed heel, with a star impressed upon it. The witness went to old man Kunde's house at about eight o'clock a. m. and arrested the old man Ludwig Kunde, Taylor Kunde, Albert Kunde and a couple of renters. Defendant was not at the house of his father, and it was ten o'clock before the witness saw him. Witness did not examine the boots or shoes of any of the parties whom he arrested, but noticed, after all the Kundes got together, that one of them wore a pair of boots with a brass rimmed heel. He could not say which of the Kundes wore that pair of boots. It was spoken of, and it was the impression of the witness that defendant's name was mentioned in that connection, but he could not testify to that fact. At old man Kunde's house witness found a six shooter under a pillow on a bed. He did not testify to that fact on the habeas corpus trial, because he was not asked. He did not testify about the brass rimmed heel and the star, before, for the same reason. Witness could not now recall that on the habeas corpus trial he stated that the small track appeared to leave either the impression of a brass heel or tacks. The

track left the impression of what witness took to be a star. Of the tracks of several persons about the ambesh, those of but three appeared to leave the ambush. The ambush, as near as witness could estimate, was between fifteen and eighteen feet distant from the point where the deceased's body was said to have fallen. It was evident that Drennon had passed the ambush a short distance when he was shot, as his body lay diagonally across the lane from the ambush, and the wadding showed the shots to have been fired in that course from the ambush.

The witness could not now say how far he followed the tracks of three persons he found about the ambushes inside of the pasture, but at least one hundred and fifty yards. They left the two ambushes together, but a short distance apart, and led directly towards old man Kunde's house, and pursued that course as far as the witness tracked them. The Kundes were arrested, so far as known to, and believed by the witness, at their houses, and none of them at Kunde's gin. When all the arrests were effected, the Kundes were kept together by witness and other guards until delivered to the officer, and had no opportunity to exchange boots and shoes. Nothing was said at old man Kunde's house as to where any of the Kunde boys had stayed on the night before—the night of the murder.

Joseph Zorn, the next witness for the State, testified that he did not go to the scene of the killing on the morning after it happened, but attended the inquest at the house of Mr. Conley. Pending the inquest, Mr. John W. Morrison brought some fragments of paper to the house, which he said he picked up on the ground of the killing, and gave them to the witness. Subsequently, on the same day, witness went to the house of old man Kunde and found some cartridges wrapped in old fragments of German newspaper, and the fragments of an old copy book. Among the pieces of German newspaper found at the house of old man Kunde was one piece into which the piece of newspaper wadding supplied by Morrison fitted exactly, completing the intelligent reading of the same, which related to the murder of a man in Arkansas or in some other of the States.

At this point District Clerk Arbuckle was placed upon the stand and testified that the papers spoken of by the witness, Zorn, had never been in his possession since he had been district clerk, and that he did not know what had become of them.

Continuing, the witness, Zorn, testified that among the papers supplied by Morrison there was a fragment or fragments of copy

book writing paper similar in every respect, as to texture and ruling, to such paper found afterwards at old man Kunde's house. Witness did not compare that paper as closely as he did the writing paper, nor did he find among them fragments that fitted to each other as in the case of the newspaper.

On his cross examination, the witness testified that Morrison gave him the fragments of paper at Conley's house between ten and eleven o'clock, during the progress of the coroner's inquest. It was between one and two o'clock when witness went to old man Kunde's house and found the larger piece of paper wrapped around one of several cartridges. Witness did not know whether or not Morrison had been to old man Kunde's house before ten o'clock. In fitting the fragment of German newspaper provided by Morrison to the piece secured by witness at old man Kunde's house, the witness encountered no difficulty. The edges of neither piece, though perhaps somewhat uneven, were jagged nor broken. Referring to his testimony on the habeas corpus trial, the witness said that he testified on that trial that Morrison brought a paper to him. It was the witness's present recollection that Morrison said he found that paper at the place of the shooting, and not at the house. Witness may have stated that he said he found it at old man Kunde's house. " When we were at the inquest Mr. Morrison brought the paper. I don't recollect whether he found it at the place of shooting, or the house. Afterwards I went to the house and found a paper in the wadding which fitted to the piece Mr. Morrison handed to me."

Question by the defense: " Did you not say in your testimony on the habeas corpus case that J. W. Morrison brought both papers and they were compared and fitted, and have you not just stated that you found the main or largest of the two papers compared, wrapped around one of the cartridges at Kunde's house, and that the piece of paper Morrison gave you fit to it so you could read from one to the other; they are evidently a part of the same newspaper?"

The witness replied: " I found at Mr. Kunde's house some writing which corresponded with the papers said to have been found at the place of killing. It is so long ago that I may be mistaken. I can only give my impression, which is that I went to the house after the inquest, and in looking around I saw on the mantel shelf a lot of cartridges which I opened to see if some of the papers around them would not fit. After looking

over a number I tore them open and found a piece that fitted the piece that Morrison had handed me. I am talking about these cartridges. The small piece of paper in which each cartridge was wrapped separately. Twelve years have elapsed, and the statement I made on the habeas corpus examination before Judge White is probably correct."

Continuing, the witness said that the cartridges were not wrapped in a bundle when he found them, but lay loose, each one wrapped separately, some in newspaper and some in writing or copy book paper. One of the pieces of newspaper taken by witness from around one of the cartridges was the piece to which he fitted the piece of newspaper given him by Morrison. Morrison said that he found the piece fitted by witness to the other piece, on the ground where the shooting took place. It was not powder burned.

At a later period of this trial district clerk Arbuckle was re-called, and produced a bundle of papers which he testified had been found among some rubbish kept in the attic of the court house. He stated, however, that he was unable to identify them as papers used in the habeas corpus trial of this case. The witness Zorn was thereupon recalled. He was handed the bundle, consisting of scraps of paper, cartridges, etc., and testified that the endorsement on the papers, namely, "papers found by Zorn at Kunde's," was in his handwriting. Having looked at the papers, he said that they appeared to be the papers he had seen before. The witness could not pronounce them to be the same papers used on the habeas corpus trial, or otherwise, without attempting to fit them together, a process that would require two hours time at least. The court, over defendant's objection, directed the witness to retire alone to another room and examine the papers.

Reproduced at a later stage of the trial, the witness, Zorn, testified that his examination of the papers with which he retired enabled him to fit some of them so as to read. The two pieces fitted produced the same printed matter read by witness from the fragments furnished by Morrison and secured by himself at Kunde's house. Over objection, he was required to read the same to the jury. The fragments conjointly read as follows:

"In Mastersville, near Waco, a young man by the name of Brooks was killed in his room while asleep by a stranger. The murderer was said to be crazy, and a few days before he was

taken up at the house of Mr. —— [the name partly torn off] in a destitute condition. He was taken up in- the house where the crime was committed a few days before he committed the crime. He put a shot gun at the head of his victim, and fired it off. He placed a shot gun at the head of his sleeping victim and fired it off."

The witness, continuing, testified that to the very best of his recollection the two pieces of paper from which he had just read were the two he saw at Kunde's house, and he thought so from the fact that the language of the two combinations was the same. He could not undertake to identify them by any similarity of appearance. Witness saw other papers at Kunde's, but was unable to identify them as papers found in the bundle. The piece of copy book paper in which a cartridge in evidence was wrapped, was similar to such paper found by him in Kunde's house.

Cross examined, the witness stated that he could undertake to identify the papers he read from only by the language of the article they constructed. One of the pieces he found around a cartridge in Kunde's house, and he knew where the other came from only by what Morrison said before the coroner's jury. He had, personally, no recollection of Morrison handing papers to him. Witness could not say which of the two papers fitted by him was handed him by Morrison. He only recollected that Morrison provided a piece of paper which he said he found on the ground of the shooting. Witness may have stated on the habeas corpus trial that Morrison brought a piece of paper to the inquest which he said he found on a shelf at old man Kunde's. Nevertheless, Morrison also produced at the inquest the piece of paper he said he found on the ground of the shooting. Witness did not think that he testified before the habeas corpus trial that "one of the pieces of wadding fitted it so that you could read from one to the other; they were evidently from the same newspaper." Witness now states that the piece of paper Morrison claimed to have found on the scene of the shooting fitted the piece witness got from around the cartridge at Kunde's.

Question by the defense. "Now, will you please explain why you stated this on the habeas corpus trial: 'Mr. J. W. Morrison brought in a paper which he stated that he found on a shelf at old man Kunde's. One of the pieces of wadding fitted to it

so that you could read from the one to the other. They are identically parts of the same newspaper'?"

Answer. "You observe there are three pieces of paper, separate and distinct, that fit together. Now I am not certain that Morrison also said he found one of the pieces at the house and another at the place of the shooting. The piece I found at the house corresponded with others when I put them together. I don't know where the others came from only from what Morrison said."

Question. "On the other examination you said that Morrison handed you a paper that he found. Do you mean a piece of paper, or the German newspaper?"

Answer. "I mean the German newspaper. They were all in fragments. There was not a full, complete piece."

Question. "How do you explain your former testimony where you say that J. W. Morrison brought in a paper which he said he found on a shelf in Kunde's house?"

Answer. "The statement taken on that examination was not carried out so strictly as it is now. It was understood that the pieces of paper was not a whole paper. They were all pieces of paper. This (taking up the largest piece of paper in the bundle) is the largest or main part of the paper, and I call it the paper. It is not more than half a newspaper. There were three pieces of paper found there."

Question. "Did you not swear on yesterday that there were two pieces of paper that fitted together, and was not that your testimony on the habeas corpus trial?"

Answer. "I don't know, sir."

Question. "Well, recollect. Did you not testify yesterday that there were two pieces of newspaper, and now you state that there were three?"

Answer. "I want to explain that. I stated previously that I am not certain whether Morrison found two pieces of paper or one. He may have brought in the pieces of paper and said he found one at the house and the other at the place of shooting."

Question. "Did you ever before speak of any other than two pieces of paper?"

Answer. "I don't recollect."

Question. "And yet you testify to-day about three papers, and you also testify that there is nothing about those papers by which you can identify them except the printed article on them?"

Answer. "In my testimony I said I brought a piece of paper from Kunde's house, and a piece was brought from the place of shooting."

Question. "But didn't you find a piece of paper at Kunde's house?"

Answer. "I found a piece of paper at Kunde's house that fitted together."

Question. "Then Morrison didn't find the piece of paper at Kunde's house?"

Answer. "I am not prepared to say whether he found it at the house or at the place of shooting. Mr. Morrison, on the examining trial, brought a piece of paper which he said he found at Kunde's house, and one at the place of shooting. Some fragments like gun wadding were delivered to the coroner, said to have been found on the ground where Drennon had been shot. I don't know whether Mr. Morrison or who handed the papers to the jury. I don't know that Morrison handed to me any or either of the papers, or who did it, and I don't know of my own knowledge where they were found. All I know about it, they fitted with the paper I found. I don't know I stated the paper I found was wadding."

Question. "You say that the paper which you fitted to the paper handed you by Morrison you took from a cartridge you found at Kunde's; yet, on the first trial, you said that Mr. Morrison brought in a paper which he stated he found on a shelf at old man Kunde's, and that one of the pieces of wadding fitted to it—that is, to the paper Morrison found. Now you say that it fitted to the paper wrapped around the cartridge that you found. Will you explain that discrepancy? Is it not a fact that you have forgotten a good deal about it after twelve years, and is it not likely that your statement at that time is more likely to be correct?"

Answer. "That is very true; but one thing is very fresh in my mind, and that is that the wadding or paper I found at the house fitted to this, but I don't know whether they were handed in to the coroner, to any part of the jury, or to myself; and I don't know of my own knowledge where they came from. The paper I found was not a piece of wadding. It was wrapped around a cartridge."

On his redirect examination, the witness, Zorn, testified that he was a member of the jury of inquest. He was then questioned by the counsel for the State as follows:

"You state that some wadding was brought to the jury of inquest—several fragments?"

Answer. "I don't know. But some pieces of paper were brought."

Question. "They have asked you about three pieces of paper. Did you not state that some fragments of paper were brought; that Morrison brought some, and that you found some pieces yourself?"

Answer. "There were three distinct pieces and they fitted together."

On his re-cross examination the witness said: "I can't explain the name of J. W. Morrison, written on the largest piece of the three fitted together. I do not know how it came there."

Doctor Fennell, testifying for the State, described the three fatal wounds in the body of the deceased, one shot passing through the body from the left side, perforating the lungs and perhaps the heart. He extracted a ball from one of the wounds of Mrs. Drennon, which was about the size of a six shooter ball. Between eight and ten o'clock, on the morning after the shooting, the witness went to the ground of the tragedy. To the left of the lane, at the point from which the shots appeared to have been fired, the witness discovered where three parties had stood. Some brush had been arranged to construct a blind. Those blinds would be to the left of parties going from church to Drennon's house, and were on the inside of Kunde's pasture. Witness saw a great many tracks at those blinds, and saw also some fragments of white paper wadding. According to the recollection of the witness, there were three tracks at one blind and two at another. Witness would not undertake to say that those tracks were made by different persons. Witness observed that one of the tracks left such an impression as would be left by a boot or shoe with a metal rimmed heel. There was a very decided difference in the sizes of the three tracks at that blind. Some fragments of newspaper were picked up both in the lane and inside of the Kunde pasture. The larger part of the paper was found inside of the pasture, between the blinds and the fence. The paper was crumpled, and had evidently been fired from a gun.

The witness was present at Conley's house when comparisons of the pieces of newspaper were made by Zorn. All of the fragments spoken of by witness, except the white paper, were fragments of German newspaper. The fragments put together

by Zorn appeared to fit each other perfectly, and Zorn, the only person present able to read·German, appeared to read from the one to the other. The impression of the iron rim on the heel of one of the tracks was distinct. The witness did not pick up any of the fragments of paper, but he examined them after they were picked up by others. The second blind was distant from the first one about twenty yards, and the third was between thirty and forty yards from the second. The fatal shots appeared to have been fired from the first blind.

Cross examined, the witness said that there were several tracks about the ambushes, but he could not say that they were made by five different persons. Witness testified on the habeas corpus trial in this case, and admitted his signature to the recorded testimony now produced. Defendant's council asked the witness the following question:

"In the habeas corpus examination you say: 'I assisted in measuring tracks about the ambush. I noticed two tracks.' Now did you notice more than two tracks?"

Answer. " Two tracks set one way, and the other tracks east. of them."

Question. " You speak of two tracks in your first examination. Please reflect and see if you remember noting any more than two tracks. Is not that probably correct?"

Answer. " I reckon so."

Question. " How do you now remember noticing more than two tracks when on your former examination you spoke of but two? Is not two probably correct?"

Answer. " Yes, sir."

Question. "And did you say: 'One was a boot or shoe, number five, with a small heel and broad front part, and the other was larger and had tacks in the heel which showed quite plain on the outside track'? Was that correct?"

Answer. "Yes, sir."

Question. " Then you don't recollect seeing more than two tracks, one number five and the other rather larger? And did you not say on the habeas corpus trial: 'I noticed particularly two tracks ; one was a boot or shoe of number five and a rather small heel and broad front part, and the other was larger and had tacks in the heel which showed quite plain on the outside track?'. And that is correct, is it not, doctor?"

Answer. " Yes, sir."

Continuing, the witness stated that the fragments of paper he

saw at the place of the tragedy were powder burned, and torn around the edges, and appeared to have been fired from a gun or guns. By the "first" ambush the witness meant the ambush nearest the church. The tracks he measured were about that ambush, and all of the fragments of paper he saw on the ground were about that ambush. The ambushes were situated from fifteen to twenty feet from the line of the fence, inside of the pasture. According to the recollection of the witness, Mr. Anderson examined the tracks with him. Hawkins and Morrison, to the best of witness's recollection, went to the ambushes before the witness got there. The ball exhibited was about the size of the ball extracted by witness from the person of Mrs. Drennon, but witness was not able to identify it as the same. It had the appearance of having been fired from a gun.

David T. Hall was the next witness for the State. His testimony was unimportant, except as to the arrest of the defendant. With respect to that, he testified that, with a posse of men, he went to Fred Kunde's house, about nine o'clock on the morning after the murder. He surrounded the house with his posse and approached it. Fred Kunde appeared on the gallery or hall. Witness told Fred his business and asked for the defendant. Fred replied that defendant was not there, but had left to go to his father's. It was then proposed to search the house; to which Fred at first objected, but finally consented. Defendant was found in the south room, not exceeding thirty or forty feet from where Fred stood, and could doubtless hear what Fred said in the conversation, but could hardly have heard what witness said. Defendant was dressed, standing about in the room. The room door was closed. The bed was made up, and one could not tell whether or not it had been occupied over night. Witness arrested the defendant and kept him until he was placed in the custody of the regular officers. Witness was not an officer, nor did he have an officer in his party. He had no warrant, but made the arrest upon his own responsibility. The boots or shoes of none of the prisoners were measured in the presence of the witness. The night of the murder, according to the recollection of the witness, was a clear starry, but moonless night.

W. T. Bryant was the next witness for the State. He testified that he was about one hundred yards behind the deceased and his wife and child when the fatal shots were fired. Witness had been to camp meeting and was on his way home. The shooting

occurred in the lane described by previous witnesses, about one and a half miles from the camp meeting ground. Two shots were fired, a short interval apart. Immediately after the last shot was fired, the witness ran forward and found Mrs. Drennon just as she got her child in her arms. He saw at once that the child was wounded, and asked Mrs. Drennon if she was hit too. She replied in the affirmative. Witness then asked for the deceased. Mrs. Drennon replied that she saw him fall up the road, and feared that he was dead. Instead of going to Drennon at that time witness ran back to Smith's store, about 200 yards distant. Returning, he took the child to her father, who was lying in the road, fifty or sixty yards from where witness found Mrs. Drennon and the child. Deceased groaned once and soon expired without speaking.

On the next morning witness went to the place of the killing, and thence to old man Kunde's house, arriving at the latter place something after eight o'clock. Witness found at Kunde's house, old man Kunde, old Mrs. Kunde, their two daughters and baby, and their sons, Taylor, Albert and William. He found also two double barreled shot guns, one being a new one, and, if his memory was not at fault, an old yäger. The right hand barrel of each of the shot guns showed by the smut to have been recently discharged. New percussion caps were on the tubes of the shot guns, both of which were muzzle loaders.

Cross examined, the witness stated that a large number of people came to the place of the killing during the night on which it occurred. Witness could not now remember whether the body was removed during the night or on the next morning. Several parties were on the ground when witness arrived on the next morning. Some were in the pasture and some in the lane, engaged evidently in examining the locality. Witness could tell by the smut on the barrels of the shot guns that one barrel of each had been recently discharged, but he could not undertake to say how many hours before he saw them. Witness had known the Kunde boys since 1872. Fred Kunde usually spoke in a loud, long tone of voice.

Thomas Reece testified, for the State, that he went to the place of the killing on the morning after it occurred, and observed what was being done, but took no part in the examination. He saw some tracks measured, and it was his recollection that the measuring was done by Hawkins and Morrison. The tracks measured were near the fence, on the inside of the pasture, at

the point from which evidently the shots were fired. He could not now remember the measurement, nor with what they were measured. Witness saw a boot measured in the court house, and it was his recollection that the boot came off of the defendant's foot, though he would not be positive in this statement. The measurement of the boot and of the track on the ground corresponded. Witness was present when some fragments of paper were examined by the jury of inquest, but he knew nothing about where the papers came from.

On his cross examination, the witness reiterated his unwillingness to swear positively that the boot to which the measure taken of the track in the pasture was applied was defendant's boot, but repeated that it was clearly his recollection that such was the fact. Witness had known the witness, John W. Morrison, for fifteen or sixteen years. Morrison's reputation for truth and veracity at the time of the killing of Drennon was good. It has not been so good since Morrison's subsequent misconduct. It can not now be called very good.

W. R. Phillips testified, for the State, that a month or two prior to the murder of Drennon, and while at work with others on Gus Kunde's farm, he heard a conversation between the defendant and some other parties, none of whom he could remember except John Oliver, of which conversation the deceased was the subject. Witness could recall no more of that conversation than that he heard Drennon's name mentioned, and immediately heard the defendant say: "He had better look out."

The death of A. B. Moore, justice of the peace of precinct number one, Gaudalupe county, Texas, in 1874, being admitted, the State introduced L. D. Louther, the present justice of the said precinct, who testified that, after diligent search, he had been unable to find the criminal docket of the justice's court for said precinct in 1874. Thereupon the State introduced in evidence the written testimony of the said A. B. Moore, deceased, taken at the habeas corpus trial. From the record it appears as follows:

"He produced the records of his court in certain prosecutions against some of the members of the Kunde family in relation to hogs of J. Drennon, and also a prosecution against two of the family for perjury. In these cases J. Drennon was the most important and an indispensable witness. Here the defendant's counsel insisted that, as a part of said written testimony of the said Moore had been read by the State, the defendant was enti-

tled to have the whole read, and asked that the testimony of the said Moore on cross examination, omitted by the State, be read, which request was refused, and the defendant excepts. The testimony of the said Moore on cross examination, rejected, is as follows: 'He also proved on cross examination that there were several prosecutions in justice court against J. Drennon, one for carrying a pistol and for other offenses, most of them on the evidence of Joseph Wilson, alias Buster, who was brought in under a subpœna to make a complaint.' "

The State next introduced in evidence two indictments, one filed on December 18, 1874, and the other on March 6, 1875. The former charged Frederick and Julius Kunde with killing a black and white spotted barrow, belonging to J. Drennon, on the twenty-second day of August, 1874. The latter charged the defendant alone with killing a certain sandy sow, belonging to J. Drennon, on the fifteenth day of August, 1874.

Francis Springs testified, for the State, in substance, that he visited the place of the tragedy early on the morning after it occurred. Witness discovered two blinds in the pasture. Two chunks were in position behind one of these blinds, fixed evidently to accommodate two persons sitting. In front of this blind the fence rider had been thrown off, evidently for the purpose of removing it as an obstruction to shot. The side of the fence at that point showed the impression of seven shot. It was evident from the tracks that two men had occupied the chunks behind this blind, as seats. But one track was discovered leading from this, the first blind, to the other, about sixty yards from the fence. This second blind was constructed at the base of a log. The tracks were traced from the first ambush for a quarter of a mile, until they struck a small mesquite prairie within two hundred yards of old man Kunde's house. They led from the first ambush immediately towards old man Kunde's house. From this point the witness and his party returned to the second ambush and followed the track from thence a short distance until it reached and was lost on some hard land. This hard land was at least a quarter of mile distant from old man Kunde's house. All of the tracks led towards that house. Measurement showed the smaller track to be that of a number six boot with a tipped heel. The other showed to be a broad heeled brogan shoe, at least one size larger. Witness knew all of the Kunde boys, and had known the defendant at the time of the killing about four years. He had never noticed the respective sizes of their

feet, and could estimate them only by the sizes of the men. Defendant was much the smallest of the Kunde boys. He always wore either a fine boot or shoe. His brothers generally wore coarse shoes on the farm and finer ones on Sunday. Fragments of paper were picked up in the lane, and one piece of wadding was found near the point where the ground showed a horse to have shied. Morrison picked up that paper wadding and gave it to the jury of inquest. Witness was not present at the examination of the papers by the jury of inquest.

Cross examined, the witness stated that he had no other reason for saying that defendant's feet were smaller than those of his brother's than that he was the smaller man, and that he, witness, afterwards observed the boots worn by defendant. Three tracks, as described on the examination in chief, were traced by witness and his party. All of those tracks were measured in the witness's presence, Morrison and Hawkins, to the best of witness's recollection, doing the measuring. Witness did not remember the measurement, except that each set of tracks were of separate sizes. Old man Kunde's house stood in the pasture, about seven hundred yards from the place of the killing. The first blind was located near the fence, and the second was some forty or fifty yards distant from the fence, a considerable distance, possibly two hundred yards, intervening between the two blinds. All of the tracks led towards old man Kunde's house, but, according to the recollection of the witness, they (the several tracks) did not come together. It was near nine o'clock when witness reached the ground of the killing.

The escape of the defendant from jail by forcing the rock floor, in 1874 or 1875, was proved by two witnesses, and the State rested.

Mrs. Caroline Kunde, the mother of the defendant, was his first witness. She testified that she heard of the killing of Jobey Drennon on the morning after it occurred. The parties who went to bed at the witness's house, on the night of the killing, were the witness, her husband, her daughter, her sons Taylor, Albert, William and the defendant, and two Mexicans who were employed on the place. Witness, her husband, her daughter and the defendant, slept in the same room on that night, the defendant retiring a few minutes before witness did. She retired at ten o'clock. Taylor, Albert and William Kunde, and the two Mexicans, went to bed on the gallery. The two Mexicans disappeared that night, and have never since been seen or heard of

by the witness. Defendant did not leave his bed that night. He occupied his pallet on the floor when the witness got up next morning, and was about the house until after breakfast, when he went to his brother Fred's, where he lived. The feet of the witness's husband and her sons, except William and Gus, were of one size, each wearing a number six, and all wearing shoes without heel tips. If the Mexicans had guns when they left the witness's house on that night, the witness did not know it. Witness recollected nothing about the size of their feet, but remembered that one of them wore boots and the other shoes. Witness retired at ten o'clock, but did not go to sleep till after twelve, during which time the defendant did not leave his pallet. He could not have left the room afterwards without arousing the witness, who was and is easily disturbed and awakened. The witness had never heard the Mexicans utter any threats against the deceased, but had heard them complain that he refused to pay them for work they had done.

On her cross examination, the witness stated that, according to her recollection, the killing occurred on the night of October 5. She was not certain of the date. She did not testify on the habeas corpus trial about the two Mexicans, simply because she was not asked about them. She said nothing about her daughter Mary sleeping in the room with her, because she was not asked about her daughter. She could not remember the names of the two Mexicans. The witness met Mr. Brewster Cameron, the gentleman present in court, about two months, perhaps more, before the defendant was returned to jail. No one had talked to the witness about this case. Witness did not know what was secured at her house by the arresting party on the morning after the killing, except the two guns which were taken from the rack on the gallery. There were some cartridges on the gallery, but none in the house. No one of the Kunde family subscribed to or received German newspapers, nor was there any German newspaper or newspapers about the witness's house at the time of the shooting. None of witness's children could write English at the time. William and Mary were then going to school, learning to write English, but at that time they were writing principally on slates. William had a copy book at the house, and had practiced English writing in that to some extent. The Mexicans did not eat supper at witness's house on the evening of the killing. They were paid off that evening before sundown. The arresting party

reached witness's house about thirty minutes after defendant left to go to his brother's.

On redirect examination, the witness testified that the Mexicans left her house almost immediately upon being paid off, and had never been seen by her since. She did not know where they slept that night.

William Kunde, the brother of the defendant, testified in his behalf that he, witness, and his brothers, Taylor and Albert, slept on the gallery of their father's house on the night of the killing, and that the defendant slept in the room with his father, mother and sister. All of witness's brothers, except Albert, were wearing ordinary number six brogran shoes at the time. Albert then wore a pair of number six boots, with metal heel tips. Two Mexicans, who had been picking cotton on the place, left between sundown and dark on the evening of the killing, each taking a double barrelled shot gun borrowed from witness's brother Taylor. Witness did not know where they went. He next saw them early next morning, when his attention was attracted by the barking of dogs. They brought their shot guns back, drew their money and left. One of these Mexicans once told witness that he had a difficulty with Drennon about money due him for cotton picking. He never heard either Mexican threaten Drennon. When witness went into the room on the morning after the killing, the defendant was up, dressing.

Cross examined, the witness said that he could not now remember at what hour he got up on the morning following the murder. Nothing unusual happened to awaken him. Witness's father paid the Mexicans off before breakfast, and they left. The Mexicans got the guns between sundown and dark on the evening before, and went off down the pasture, and witness saw no more of them until next morning. They did not sleep on the gallery that night. Defendant at that time lived at the Brown house with his brother Fred, but sometimes stayed over night at the old man's and on those occasions always slept in the room. Two shot guns and an old rifle were kept at the house. Witness noticed one of the shot guns on the gallery the next morning, when the arresting party arrived. The other shot gun, he thought, was then in the house. Witness did not know from which direction the Mexicans came to the house on the morning after the killing. They reached the house before witness saw them. He did not know to whom they returned the guns.

The witness had no recollection of having a copy book in the

house at the time of the killing. He was not attending school at that time, but was driving the cotton gin. He had previously attended school, and then had a copy book, in which he wrote, but if he took it home from school he did not recollect it. It was his impression that he left it at school. He knew nothing about any buck shot or other cartridges being about the house. Witness had met Mr. Cameron in Seguin and at his father's house, and had perhaps heard him mention the defendant's name. He had not talked to Cameron about this case, nor did he know Cameron's business when he met him. Witness knew about the Mexicans as well on the habeas corpus trial as he did now, but said nothing about them because he was not asked.

Amelia Kunde, the wife of Frederick Kunde, was the next witness for the defense. She testified, in substance, that the defendant lived at her husband's house for some time previous and up to the time of Drennon's death, but frequently spent the night at old man Kunde's, a mile distant. He left Frederick's house late on the evening before the killing, and did not return until breakfast was over next morning. He had been at the house some little time before the arresting party arrived. Witness met the arresting party first. They asked her if the defendant was at the house, and she unhesitatingly told them that he was. The party did not see witness's husband for some minutes later. Her husband did not admit them into the house at once, because they were numerous and heavily armed, and it was not known what they might do. Two Mexicans worked for Frederick Kunde until eight or ten days before the killing, when they went to old man Kunde's to work. She did not know when they left old man Kunde's.

Mary Stahl, nee Mary Kunde, the sister of the defendant, testified in substance that she, her father, mother, sister and the defendant, slept in the same room in her father's house on the night of the killing, and that her brothers Taylor, Albert and William, slept on the gallery; that those sleeping in the room retired about eight o'clock, and that defendant did not go outside of that room during the night. Two Mexicans, who had been at work for her father over a week, left the house after sun down on that evening, each having a gun, which guns, so far as witness knew, belonged to her brother Taylor. She had never seen them since.

Cross examined, the witness said that, while in her father's employ, the two Mexicans slept on the gallery. Witness saw

her brother Taylor pay the Mexicans off, in the hall of the house, before they left the house on that evening. Taylor owned two shot guns and an old rifle. These guns were on the gallery when the arresting party came next morning. Witness knew nothing about any ammunition or cartridges being kept in the house. There were no German newspapers taken at the house, and there were none in the house, so far as she knew. There was no writing paper in the house. Witness was not then attending school. None of the witness's brothers who were at the father's house left it on that night. The boys all wore number six shoes, and were wearing shoes at the time. If any of the heels were metal tipped, witness did not know it. Witness had no recollection of seeing any one about the house on the next morning until the arresting party came, except the members of the family. Taylor Kunde escaped from jail in 1875, and witness had not seen him since. She did not know where he was.

W. A. Lannam, the defendant's brother-in-law, testified in his behalf, in substance, that all of the Kunde boys wore number six boots or shoes. He knew this from the fact that he himself wore a number six, and it was a matter of frequent remark that he and all of his brothers-in-law wore the same number. Defendant usually wore shoes about the farm, and at work, but when riding about the country or away from the farm, in town or on Sundays, he generally wore boots. Witness had met Mr. Cameron several times. He was first sent for by Cameron, who told him that he wanted to talk about defendant's case. Witness knew by report of a difficulty between deceased and Taylor and Albert. By the same means he knew of other difficulties of deceased, but he had no personal knowledge of any.

John Oliver was next introduced by the defense. He testified that he was present on the previous day, and heard, in part, the testimony of the State's witness, W. R. Phillips. He denied emphatically that he was ever at any time in the company of the defendant and Phillips and others in old man Kunde's field, when, in the course of a conversation about the deceased, the defendant said: "He (Drennon) had better look out." The witness had no recollection of ever meeting Phillips and defendant in the same party, or together. He had never heard defendant make any kind of a threat against Drennon. There was absolutely no truth in Phillips's statement, so far as the witness's presence was concerned, at the time and place; nor did he ever

hear such a statement made by defendant at any other time or place.

T. J. Southern testified, for the defense, that he knew of trouble that existed between Drennon and Taylor and Albert Kunde prior to the killing of Drennon. That trouble arose over the ginning of a bale of cotton. The witness never heard any threats uttered by either Drennon or Taylor or Albert Kunde about that matter. Witness knew also of Drennon's charges against the Kunde boys about the killing of his hogs. The witness heard the report of the gun and the squealing of the hog at the time Drennon alleged his hog was killed. The gun was fired and the hog squealed in the direction of Fred Kunde's house. The defendant at that very time was at the witness's house, about three hundred and fifty yards distant from Fred Kunde's. Witness saw Drennon going out of the pasture gate that evening about an hour before sun set. On the day of the examining trial of the hog case, Drennon told witness, in the presence of Alex Henderson, that defendant had nothing to do with the killing of his hog—that it was Fred who killed it. This occured but a short time before the killing of Drennon. Witness knew the defendant to have been, at the time of the hog troubles, more than peaceably inclined towards Drennon. He knew that, in order to prevent trouble between Drennon and his brothers, the defendant told his brothers that he, defendant, left the pasture gate open and let the stock out, when in truth and in fact it was Drennon who did so. Defendant's reputation was that of a quiet, peaceable, law abiding man. Defendant always manifested a friendly feeling towards Drennon, and never spoke even harshly of him in the hearing of the witness. Witness's feelings towards Drennon had always been passive but kindly. He had no enmity towards Drennon, but kept him at arms' length. He had never had a quarrel with Drennon.

P. C. Barrington testified, for the defense, that at one time he was familiar with the cotton trouble between Drennon and Taylor Kunde, but had forgotten much about it. He could remember only that, shortly before he was killed, Drennon told him that he got two bales of cotton from a negro in a trade; that nothing was said in the trade about who was to pay Taylor Kunde for ginning it; that Taylor would not give the cotton up until his payment was secured, and that he was going to have the cotton. If the trouble was ever settled, witness did not know it. The

witness did not know whether the hog troubles involved the defendant as well as Taylor and Fred Kunde.

At this point the defense proved the death of E. T. Rhodes, and proposed to reproduce his testimony as given upon the habeas corpus trial. Upon objection, this testimony was rejected, and this ruling is made the subject matter of the fourth head note of this report. The bill of exceptions (omitting the formal parts) reserved to this action of the trial court, reads as follows : "Defendant, having proved by his witness, W. M. Rust, that he was present at the habeas corpus trial, October 28, 1874, on the application of this defendant and his co-defendants for bail upon the charge of the murder of Jobey Drennon, * * and heard and remembered the testimony of E. T. Rhodes, now dead, offered to prove by said witness the testimony of said Rhodes as follows : 'Taylor Kunde, one of the parties charged with the murder of said Drennon, on the thirty-first of August, 1874, purchased a double barreled shot gun and powder and shot, and then threatened to kill said Drennon in consequence of a controversy about some hogs, of which threats the said Rhodes apprised the said Drennon,'—for the purpose of showing that said Taylor Kunde, and not defendant, had a motive to kill deceased, etc."

The excluded testimony of Mrs. Emma Kunde is covered by the same ruling of this court. It is shown by the bill of exceptions to have been to the effect "that, a short time previous to the killing of the deceased, Drennon, said Drennon pursued Albert Kunde, one of the parties charged with the murder of said Drennon, to the house of said witness, and there the said Drennon, cursing the said Albert Kunde, threatened to kill him, when witness prevented the said Albert Kunde from being shot by the said Drennon by getting the said Albert Kunde into her house, and causing said Drennon to be taken away."

Joseph Zorn, called by the defense, testified that a large crowd of men collected during the day and evening succeeding the murder. During that day a man told witness, in a private conversation, that a party wanted to take the Kunde boys, including the defendant, and the old man, away from the constable and hang them, and that he wanted to consult witness about such a course before it was done. Witness protested vehemently against such action, and the prisoners were taken to town. After the habeas corpus trial the proposition was renewed to the witness by the same man. A great crowd was present about the court house on the night the habeas corpus trial was concluded.

They were confronted by Judge John P. White, the then district judge, who in a speech from the court house steps appealed to them to refrain from violence and to permit the law to take its course, pledging himself to see that full justice would be done to all sides at the trial, which would be called in a month. The feeling in that part of the county in which the murder was committed was very much against the Kundes. The people generally in that section believed them guilty of the assassination, and, fearing that by means of their money they would be able to employ expert counsel and secure acquittal, they wanted all the Kundes, the old man, defendant, Fred, Taylor and Albert, hanged without delay or ceremony. Hawkins was the man who spoke to the witness about the matter.

W. M. Rust testified, for the defense, that he knew Parson P. P. Jones, now deceased. It was the witness's distinct recollection that Parson Jones, on the habeas corpus trial, testified that he carefully examined the ground where the killing took place, and that but two tracks were discovered, one being a number five or six in size, and the other larger, probably a seven or an eight. Just before going into the habeas corpus trial on October 28, 1874, some parties who had been to the scene of the assassination informed witness, who was the counsel for the defendants, that there was then a crowd in court who intended to take and hang the Kundes, and advised witness to be careful in action and speech. As soon as Judge White gave directions to the proper officers to summon a posse to protect the prisoners, he and witness left the court house, meeting the crowd at the stile over the court house yard. Judge White mounted the stile and asked the crowd what they intended doing. Some one replied that they were going to take the Kundes. Thereupon Judge White made the address to the crowd testified to by the witness Zorn.

Witness saw the measurement applied to the foot spoken of by some of the witnesses for the State. As counsel he made profert of the feet of all the Kundes. The measure was applied to but one foot, and that was the foot of Albert Kunde, who wore a pair of brass heeled store boots. The other defendants wore brogan shoes, all about number six in size. Referring to the smallest of the pieces of German newspaper used on the habeas corpus trial, and claimed to be the one picked up by Morrison on the ground of the shooting, and designated as the piece of wadding, the witness testified that he subjected it to a

test on the trial under a magnifying glass, and subsequently to another test under a more powerful magnifier, in the presence of Esquire Moore, and failed to discover the least discoloration or powder burn on it. In like manner, and with like results, he tested the larger piece. About ten days before the present term of court opened, the defendant came to witness's office in Seguin, in company with Mr. Cameron, and sent for and surrendered himself to the sheriff.

Brewster Cameron testified, for the defense, that he first became acquainted with the defendant in Tucson, Arizona, in the summer of 1884. Defendant came there to get some mares, purchased by the witness's brother, who then lived on the "Rancho San Rafael de la Zarijo." Defendant came to Seguin with the witness, to answer to the charge of murdering Jobey Drennon. Witness first came to Seguin in November, 1885, in regard to this matter. Witness then had a conference with local attorneys who, after conferring with the district attorney, advised him that the State could not possibly prepare for trial at that term of the court. Defendant was not placed in arrest until his arrival in Seguin, a few days before the present term of court. Upon their arrival in Seguin, witness and defendant went to the office of Captain Rust, who sent for Sheriff McGuffin, to whom, on his arrival, the witness introduced the defendant. Witness then accompanied the defendant to jail.

Cross examined, the witness said that he first heard of the defendant in the early part of 1883, when he, defendant, was the foreman of the ranche now owned by the witness and his brother in Arizona. Defendant has been at that ranche ever since. The witness desired a trial for the defendant at the November term, 1885, in order to prevent his confinement in jail for six months. The district attorney would not agree to admit him to bail in order to avoid that delay, saying that he would not make terms with a man in the brush; of which professional rule the witness approved, and returned home. Defendant was in the employ of witness and his brother until coming to Seguin just before this trial. He has been on the ranche in Arizona since 1878. Witness came with him when he came to surrender. Witness did not go to see the witnesses in this case before surrendering defendant, but went to see defendant's relatives for other purposes. He went to see Mrs. Kunde with a message, and talked with her with much difficulty for perhaps twenty minutes. Witness talked to William Kunde, but not about this

case. He talked to Gus Kunde unreservedly about defendant, because defendant referred him to Gus and Mrs. Lannam. Witness was both the friend and the counsellor of the defendant. Witness did not know that a requisition had been sent for defendant, and had never told local counsel that the defendant's reason for surrendering was that a requisition was out for him. Among other inquiries made by witness was whether a requisisition had ever been sent out. He knew that certain parties wanted a reward for the defendant's arrest, and did not want a requisition issued unless a reward was offered. Defendant would have surrendered in November, 1885, had the witness been able to secure a trial for him at that term, and had he been able to so inform him, defendant would have come to Seguin on telegraphic notice. Assured that no trial could be had at that time, and failing to precieve any advantage either to himself or the State by his lying in jail six months, the witness advised him not to come then. In November, 1885, witness wrote to Captain Rust asking if a requisition had issued, and, if not, to advise him if one should issue. Rust replied that none had issued so far as he could learn, but that an Arizona sheriff was endeavoring to secure the offer of a reward for the defendant. The defense closed.

The State introduced Hugh McGuffin in rebuttal. He testified that he wore boots number four. The defendant put on the witness's number four boot on the day before this witness was examined. Witness knew that requisitions for the arrest of the defendant had been sent to Arizona. The first one was sent some six or eight months prior to this trial. The last one was sent about three months ago.

Cross examined, the witness said that he was the sheriff of Guadalupe county, and had the defendant in custody at the time he tried on the boots. Defendant observed witness's foot and asked the number of his boot, and when told, asked permission to try the boot on. The boot was an old one, number four in size.

The motion for new trial raised the questions discussed in the opinion.

*W. M. Rust,* and *Wœlder & Upson,* for the appellant: I. For the purpose of showing a motive on the part of the defendant to kill the deceased, an indictment against the defendant found prior to the killing, at the instance of the deceased, or in the

finding of which he was an important witness, might be admissible in evidence; but an indictment found after the killing of deceased is not admissible in evidence for any purpose. (16 Texas Ct. App., 354; 14 Texas Ct. App., 346; 15 Texas Ct. App., 227; 7 Texas Ct. App., 549; 6 Texas Ct. App., 433; 20 N. W. Rep., 724.)

II.   The court erred in permitting the State to read in evidence the portion of the written testimony of A. B. Moore, taken on the habeas corpus trial, October 28, 1874, before Judge John P. White; and in not permitting the defendant to read in evidence the balance of said Moore's testimony, for the reasons stated in the bill of exceptions, because:

First.   The introduction of evidence tending to show that "some members" of the family to which defendant belonged had been prosecuted for crime at some indefinite period, without in any way connecting the defendant with such prosecution, seems so clearly erroneous as to need no authority to support the proposition of its inadmissibility.

Second.   A statement that an officer produced the records of his court in certain prosecutions is not the best evidence of the contents of such records, and is no proof of the same.

Third.   When part of an act, declaration or writing is given in evidence by one party, the whole may be given in by the other. (Code Crim. Proc., Art. 751; 8 Texas Ct. App., 254; 9 Texas Ct. App., 129.)

III.   In a case where the evidence is wholly circumstantial, the defendant is entitled to any and all evidence calculated to throw light upon the transaction, and especially to any fact or circumstance which might tend to show that some other person did the killing. (Cooper v. The State, 19 Texas, 449; Means v. The State, 10 Texas Ct. App., 16; Dubose v. The State, 10 Texas Ct. App., 230; Hart v. The State, 15 Texas Ct. App., 202; Barnes v. The State, 41 Texas, 342; Noftsinger v. The State, 7 Texas Ct. App., 301; Schultz v. The State, 13 Texas, 401; McInturf v. The State, 20 Texas Ct. App., 554.)

IV.   The court erred in not permitting defendant's witness, William M. Rust, to testify to the testimony of the deceased witness, E. T. Rhodes, given on said habeas corpus trial.

V.   The court erred in not permitting the defendant's witness, Mrs. Emma Kunde, to testify to the attempt of deceased, Drennon, to kill Albert Kunde, one of the defendants charged with his murder.

VI. The court erred in admitting in evidence the bundle, consisting of gun wadding, pieces and scraps of paper, cartridges and buck shot.

VII. Where discredit is sought to be cast upon the credibility of a witness for stating certain important facts on one trial, which facts such witness omitted to state on a former trial, evidence giving any reasonable explanation for such omission should be permitted in vindication of the credibility of the witness.

*J. H Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. Defendant's first and second bills of exception will be considered together. It is well settled that an indictment against the defendant, charging him with a separate offense from the one for which he is on trial, may be introduced in evidence against him when such indictment tends, even in a remote degree, to show a motive on the part of the defendant to commit the crime for which he is on trial. (Rucker v. The State, 7 Texas Ct. App., 549; Taylor v. The State, 14 Texas Ct. App., 346; Hart v. The State, 15 Texas Ct. App., 227; Robinson v. The State, 16 Texas Ct. App., 347.) It is, however, contended by counsel for defendant that the indictments read in evidence in this case were not admissible for any purpose, because they were not presented against defendant until subsequent to the date of the murder of Drennon. This would be an insuperable objection if the said indictments were not connected by other testimony with transactions which occurred before the murder, and which tended to show motive on the part of defendant to commit the murder. It was shown by the reproduced testimony of the deceased witness, Moore, who was a justice of the peace, that shortly prior to the murder of Drennon, some of the Kunde family were prosecuted before him in relation to hogs belonging to Drennon, and that there was also a prosecution before him against two of the Kunde family for perjury, in which said Drennon was an important and indispensable witness. This evidence shows that some of the Kunde family were charged with some offense relating to Drennon's hogs shortly before Drennon was murdered. It is presumptively shown by the indictment read in evidence that one of the members of the Kunde family who was thus accused was the defendant, Julius Kunde, and that he was charged with willfully and maliciously killing

hogs belonging to said Drennon, and the offenses are charged in the indictment to have been committed at a date prior to the murder of Drennon. We are of the opinion that the testimony of Moore was admissible to prove motive, although such testimony is very meagre and indefinite, and that this testimony rendered admissible the indictment in order to explain that defendant was one of the Kunde family, who had been charged before the murder with an offense in relation to deceased's hogs. We think the objections made to this evidence reach only to its weight and not to its admissibility.

Another question presented by the second bill of exception is the correctness of the ruling of the court refusing to permit defendant to read in evidence the balance of the reproduced testimony of the witness, Moore, the State having read in evidence only a part of said testimony, which testimony was in writing, being the testimony delivered by said witness on the trial of this cause upon habeas corpus. Counsel for defendant contend that, as a part of said testimony had been read in evidence, defendant was entitled to have the entire testimony read in evidence, under the provisions of Article 751 of the Code of Criminal Procedure. That article reads: "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; as, when a letter is read, all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence."

That portion of the testimony of Moore which was read in evidence by the State related to prosecutions against some of the Kunde family. That portion of said testimony which defendant proposed to read related to prosecutions against the deceased Drennon. It is obvious that the portion of said testimony offered to be read by defendant had no relation whatever to that portion read by the State—was not necessary to make the portion read fully understood, nor did it any way explain the same. It was clearly inadmissible by virtue of the article of the code quoted, and it was not admissible under any rule of evidence.

II. It was error to refuse to permit the defendant to reproduce the testimony of the deceased witness, E. T. Rhodes. By this testimony defendant proposed to show acts and declarations on the part of his co-defendant, Taylor Kunde, occuring shortly

prior to the murder, which said acts and declarations tended strongly to show malice on the part of Taylor Kunde towards Drennon, and a motive on his part to commit the murder. It was shown by other evidence in the case that Taylor Kunde was near the place of the murder at the time it occurred, and had equal opportunity with defendant to commit the murder. Also, that on the night of the homicide said Taylor Kunde furnished two Mexicans with a double barreled shot gun each, that said Mexicans left said Kunde's house that night, before the murder, carrying said guns with them, and that they did not return with said suns until the next morning, and that one barrel of each of said guns then appeared to have been recently discharged.

We presume that the learned trial judge rejected the proposed testimony upon the authority of Bowen v. The State, 3 Texas Court of Appeals, 617; Boothe v. The State, 4 Texas Court of Appeals, 202; Walker v. The State, 6 Texas Court of Appeals, 576; Holt v. The State, 9 Texas Court of Appeals, 571; and per-haps some other early decisions made by this court. The doctrine of these cases, in the broad terms therein announced, while perhaps sustained by the weight of authority, at the time the decisions were made, is no longer the doctrine recognized by this court, and by what we consider the weight of authority of the present day. That is, the rule announced in those cases has been qualified and very much modified by recent decisions, and is not the rule which now obtains. (Dubose v. The State, 10 Texas Ct. App., 230; Hart v. The State, 15 Texas Ct. App., 202.) In McInturf v. The State, 20 Texas Court of Appeals, 335, it is said, "the rule now established is that investigation with reference to other parties than the accused should not be permitted in cases either positive or circumstantial, unless the inculpatory facts are such as are proximately connected with the transaction. In other words, to show remote acts or threats would not be admissible unless there were other facts also in proof proximately and pertinently connecting such third party with the homicide at the time of its commission." (Citing Means v. The State, 10 Texas Ct. App., 16; Aikin v. The State, Id., 610; Hart v. The State, 15 Texas Ct. App., 202; 72 Ala., 522; see also 15 Lea, Tenn., 694, a case in point.) The proposed testimony of the witness Rhodes, under the rule above stated, was clearly admissible. The inculpatory facts against Taylor Kunde disclosed by this testimony are proximately connected with the murder of Drennon. There are, also, other facts in evidence which proximately

and pertinently connect Taylor Kunde with said murder, and which render the theory that he committed said murder, or had it committed, fully as probable as that defendant committed or was concerned in its commission. Manifestly, to our minds, the proposed evidence was relevant, admissible and material, and its rejection is error for which the conviction must be set aside.

III. For the reasons stated in discussing the admissibility of the testimony of Rhodes, the testimony of Mrs. Emma Kunde as to a difficulty between deceased and Albert Kunde, a short time previous to the murder, was also admissible, and the court erred in rejecting it.

IV. The bundle of papers admitted in evidence were sufficiently identified, and it was not error to admit them in evidence; nor was it error to permit and direct the witness Zorn to retire from the court room into a room by himself for the purpose of thoroughly examining said papers with a view to identifying and explaining them in his evidence.

V. It was error to refuse to permit the witness Rust to testify as to the cause why some of the defendant's witnesses were not asked, on the habeas corpus trial, as to the two Mexicans who were at Kunde's house on the evening of the murder. It was sought by the State to cast discredit upon the testimony of some of defendant's witnesses who testified about the Mexicans, by showing that when these same witnesses testified on the habeas corpus trial they did not state anything about the two Mexicans. Defendant sought to show by the testimony of Rust that said witnesses, on the habeas corpus trial, were not interrogated as to the Mexicans, that he was counsel for the prisoners on that trial, and that he did not undertake to develop the evidence in behalf of them, because, owing to the great prejudice then existing against said prisoners in the minds of the people, he did not expect to obtain bail for them. This testimony would have afforded a reasonable explanation of the silence of the witnesses in regard to the Mexicans, when said witnesses testified on the habeas corpus trial, and would have tended to remove any unfavorable impression as to the credibility of said witnesses which might have been created upon the minds of the jury, by said silence. (Wilson v. The State, 17 Texas Ct. App., 525; Phillips v. The State, 19 Texas Ct. App., 158.)

VI. A number of objections are urged to the charge of the court. No exceptions to the charge were made at the time of the trial. After a careful study of the charge, we fail to per-

ceive any material error in it. No additional charges were requested by the defendant.

VII. The twenty-second assignment of error calls in question the sufficiency of the evidence to support the conviction. Circumstantial evidence alone is relied upon by the State to sustain the conviction. After very careful and repeated examination of the evidence as presented in the statement of facts, we unhesitatingly say that to our minds it is wholly insufficient to warrant the conviction. There are but few circumstances which tend even remotely to prove this defendant's connection with the murder, and none of these inculpatory circumstances are at all inconsistent with his innocence, nor are any of them incapable of explanation upon any other hypothesis but that of his guilt. Taken altogether, the circumstances are far from being of a conclusive nature. They do not lead the mind to a satisfactory conclusion, and do not produce a reasonable and moral certainty of the defendant's guilt. In other words the evidence, being wholly circumstantial, is not of that of force, certainty and conclusiveness demanded by the law in support of a conviction for felony. (Pogue v. The State, 12 Texas Ct. App., 283; Lovelady v. The State, 14 Texas Ct. App., 545; Rye v. the State, 8 Texas Ct. App., 153; Hunt v. The State, 7 Texas Ct. App., 235; Robertson v. The State, 10 Texas Ct. App., 602; Black v. The State, 1 Texas Ct. App., 369; Barnes v. The State, 41 Texas Ct. App., 342.)

Other errors are assigned, but they are of a character not likely to occur on another trial, and we pass them without discussing or deciding them. Because of the errors in the rulings of the court in relation to evidence, which we have pointed out, and because the court erred in not granting defendant a new trial because of the insufficiency of the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 27, 1886.